**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 04-CR-0099-CVE** |
| | ) | **(07-CV-0551-CVE-FHM)** |
| RODERICK WALKER, a/k/a "Rudd," | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

On October 1, 2007, defendant Roderick Walker, also known as "Rudd," a federal prisoner

appearing pro se, filed a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255

(Dkt. # 116).  Section 2255 provides that "a prisoner in custody under sentence of a court established

by Act of Congress claiming the right to be released upon the ground that the sentence was imposed

in violation of the Constitution or law of the United States . . . may move the court which imposed

the sentence to vacate, set aside or correct the sentence."

**I.**

On June 10, 2004, a federal grand jury returned an indictment charging Walker with one

count of conspiracy to distribute Lysergic Acid Dietheylamine ("LSD") in violation of 21 U.S.C.

§ 846, and four counts of using a communication facility to distribute LSD in violation of 21 U.S.C.

§ 843.  Dkt. # 1.  Walker was arraigned on August 10, 2004 and Michael Arnett appeared at the

arraignment as Walker's retained counsel. The government filed a superseding indictment adding

a sentencing allegation that Walker possessed and distributed more than 120 grams of a mixture or

substance containing LSD.  Dkt. # 6, at 5.

Arnett attempted to negotiate a plea agreement with Assistant United States Attorney, Robert Raley ("Raley" or "AUSA"). Based on the sentencing allegation in the superseding indictment, Walker was facing a mandatory minimum sentence of ten years and a maximum sentence of life imprisonment. 21 U.S.C. § 841(b)(1). Raley agreed to file a superseding information reducing the amount of LSD involved in the conspiracy to more than 7 grams but less than ten grams. This would have reduced the mandatory minimum sentence to five years with a maximum sentence of 40 years. Arnett states that he repeatedly advised Walker to accept the plea agreement because, if Walker refused to change his plea, the government would file an enhancement information under 21 U.S.C. § 851 based on Walker's three previous drug trafficking convictions. Dkt. # 137-2, Ex. A, at 2. If the government were to file an enhancement information and Walker were convicted at trial, Walker would face a minimum sentence of life imprisonment.

In compliance with the plea agreement, the government filed a superseding information, on December 30, 2004, reducing the drug quantity. The Court set a change of plea hearing for January 4, 2005. However, Walker refused to admit that he was guilty of conspiracy to distribute LSD and the Court could not accept his guilty plea. The Court permitted the government to withdraw the superseding information and entered a new scheduling order setting a jury trial for April 4, 2005. Dkt. ## 19, 21. The government subsequently filed an enhancement information on March 17, 2005, notifying Walker that the government intended to seek an enhanced sentence based on his three previous drug trafficking offenses. Dkt. # 40.

In February 2005, Walker informed Arnett that he wished to terminate their attorney/client relationship and Arnett filed a motion to withdraw as Walker's attorney. Dkt. # 24. Two weeks after filing the motion to withdraw and while it was pending, Arnett filed a motion requesting

2

discovery of audiotapes containing phone conversations between Walker and unindicted co-conspirators.  Dkt. # 28.  At the pretrial conference on February 24, 2005, the Court found both motions moot and Arnett continued to represent Walker.  On March 29, 2005, the government filed a notice pursuant to Fed. R. Evid. 404(b) that it intended to use evidence of other crimes committed by Walker at trial.  The government also filed a motion in limine to exclude evidence concerning Walker's former girlfriend, Elena Heschmeyer's, "part-time profession as a dominatrix."  Dkt. # 48.  The Court took both matters under advisement.

Walker's trial began on April 4, 2005.  The first witness called by the government was Charles Ledbetter.  Ledbetter, a 23 year old college student from Springfield, Missouri, executed a plea agreement with the government on October 4, 2004 in which he agreed to plead guilty to two counts of possessing LSD with intent to distribute.  However, Ledbetter was not set for sentencing until April 26, 2005, and the government agreed to move for a downward departure if Ledbetter provided truthful testimony against Walker and others.  Ledbetter testified that he met Anthony May in the Spring of 2003 and he purchased ten hits of LSD from May at a party.  Ledbetter sold the LSD at the same party.  Several weeks later, Ledbetter purchased 400 hits of LSD from May for resale.  He testified that he also purchased 30 psilocybic mushrooms from May.  When Ledbetter purchased the mushrooms, they had already been ground up, mixed with chocolate candies, and individually wrapped as suckers or Halloween shapes.

On August 18, 2003, Ledbetter drove to Oklahoma to sell LSD to a person named Sean.  Sean was actually Special Agent Sean Henry of the Drug Enforcement Agency ("DEA").  Henry met Ledbetter at a TGI Friday's restaurant in Tulsa, Oklahoma and purchased 95 hits of LSD from Ledbetter for $760.  On September 2, 2003, Henry purchased 300 hits of LSD from Ledbetter in

3

Catoosa, Oklahoma for $3,000.  Henry called Ledbetter to arrange the purchase of liquid LSD and Ledbetter agreed to sell Henry four vials of liquid LSD for $3,200.  The transaction occurred on September 8, 2003 at the same TGI Friday's restaurant in Tulsa.  Henry told Ledbetter that he was not sure how to prepare the liquid LSD for sale.  Ledbetter drew a paper grid for Henry and showed him how to place the liquid LSD on the grid.

Henry called Ledbetter to arrange another purchase, but Ledbetter stated that he was a middle man and could not always contact his supplier.  Ledbetter arranged a meeting between Henry and May for September 25, 2003 in Tulsa.  Ledbetter, May, and Thomas Mullen[1] drove from Springfield to Tulsa on September 25, 2003 for the meeting, because Henry told Ledbetter that he could sell a large quantity of marijuana to them.  At that meeting, May sold 300 hits of LSD to Henry.  On October 27, 2003, Henry asked Ledbetter to come to Tulsa.  Henry arrested Ledbetter and Ledbetter immediately agreed to cooperate with the government.  Ledbetter claimed that his sole source of LSD and hallucinogenic mushrooms was May, and he agreed to assist the DEA with its investigation of May.  Ledbetter learned that May purchased narcotics from a source known as "Tweek" or "Rudd" out of Kansas City and New York.  May told Ledbetter that he met Rudd in Kansas City, or sent a money order to Rudd in New York, to purchase LSD.  May explained that he would ordinarily send a money order to Rudd in New York to purchase LSD and he would receive a package in the mail containing LSD.  To purchase mushrooms, May would personally meet Rudd in Kansas City.

---

[1]    Mullen was an associate of May and he testified against Walker at trial.  See Dkt. # 97, at 430-54.  Mullen stored LSD and psilocybic mushrooms in his apartment and took part in the September 25, 2003 transaction, but he did not have any direct dealings with Walker. Because Mullen's testimony is duplicative of Ledbetter's and May's testimony, the Court will not discuss his testimony in detail.

4

At trial, May testified that he met a person identified as Rudd at the Schwagstock Festival in Missouri in May 2003.  Rudd sold him 100 hits of LSD and gave May his cell phone number if May wanted to arrange any future transactions.  During the trial, May identified Walker (a/k/a "Rudd") as his source for LSD and hallucinogenic mushrooms.  From June to October 2003, May called Rudd four times to purchase LSD through the mail and May testified that he would sell the LSD to Ledbetter for distribution.  The first transaction occurred in July 2003.  May called Walker to purchase 500 hits of LSD and Walker told May to wire $700 to Christy Lee in Buffalo, New York.  After May wired the money, Walker sent him a package containing 500 hits of LSD.  The other three LSD transactions occurred in a similar manner.  In addition to mail transactions, May met Walker in Kansas City about four times to conduct transactions in person.  In June 2003, May called Walker to purchase LSD and psilocybic mushrooms and Walker told May to come to Kansas City.  May met Walker at a shopping mall and Walker told May to follow him in his car.  After driving around for 20 or 30 minutes, Walker stopped at a Dairy Queen and stepped out of his car.  Walker approached May's vehicle and handed him 500 hits of LSD and approximately 75 to 100 mushrooms.  In exchange, May paid Walker over $2,000.  May testified that other transactions occurred in a similar fashion except that the meeting places and the locations of the sale differed on each occasion.  May estimated that he purchased a total of 4,000 hits of LSD and 400 to 500 hundred mushrooms from Walker.

Turning back to May's relationship with Ledbetter, May directly contacted Henry after Ledbetter informed May that Henry was interested in purchasing LSD directly from May.  May admitted that he met with Henry on September 25, 2003 and sold him 300 hits of LSD at a TGI Friday's restaurant in Tulsa.  May explained that the market for LSD and psilocybic mushrooms was

saturated in Springfield and he was looking to expand his sales to Oklahoma.  On November 25, 2003, May drove to Afton, Oklahoma to sell Ecstasy to Henry.  Henry arrested May and took him into custody.  May agreed to cooperate with the government.  Later that day, he called Walker twice while Henry and another officer monitored and recorded the call.  Walker and May used slang terms for drugs to disguise the subject matter of the phone call, but May asked Walker about arranging a purchase of LSD and psilocybic mushrooms from Walker for the same price and quantity as their previous transactions.  In the second phone call on November 25, 2003, Walker told May to send two wire transfers of $950 to Ann Smith in Buffalo, New York to complete the transaction.  May also made two more monitored calls to Walker on January 20, 2004 to arrange a drug transaction. The January 20, 2004 calls were a continuation of the previous conversation on November 25, 2003, because the transaction discussed on November 25, 2003 did not occur.  The DEA did not want to wire money to Walker without some assurance that Walker would send the narcotics.

Walker's former girlfriend, Heschmeyer, testified at trial about her knowledge of Walker's drug transactions.  The Court initially questioned Heschmeyer outside the presence of the jury about her part-time profession as a dominatrix and prohibited either party from asking Heschmeyer about her profession due to the prejudicial nature of this evidence.  Heschmeyer testified that she had known Walker for 14 years and knew him as "Rudd."  She was engaged to Walker at one time but they did not marry.  She admitted that she had used a wide range of drugs and had a felony conviction for possessing methamphetamine.  Concerning her involvement with Walker during the relevant time period, she stated that Walker called her on August 19, 2003 and told her that he was driving from New York to Kansas City.  Walker asked Heschmeyer to accompany him on a trip to San Francisco, California, and offered her $800 as an incentive.  She agreed to go to San Francisco

6

and they left Kansas City on August 20, 2003.  Walker claimed that he was going to San Francisco to sell jewelry, but it became apparent to Heschmeyer that Walker was arranging LSD transactions during the trip.  Dkt. # 98, at 485.  They arrived in San Francisco on August 24, 2003.  Heschmeyer heard Walker and three other individuals discussing the purchase of ten books, or 10,000 hits, of LSD.

While they were in San Francisco, Walker spoke to May on the phone and asked May to wire $1,500 to San Francisco in Heschmeyer's name.  Heschmeyer picked up the money from Western Union and gave it to Walker.  On August 25, 2003, Heschmeyer also received wire transfers of $2,500 and $2,000 from May and delivered the money to Walker.  They stayed in San Francisco for four nights and, at the end of their stay, Heschmeyer observed Walker with ten sheets of LSD.  However, Walker was unable to purchase liquid LSD while in San Francisco.  On the way home to Kansas City, Walker and an associate drove through Springfield, Oregon and purchased ten pounds of psilocybic mushrooms.  Id. at 505.  After stopping in Oregon, Walker and Heschmeyer began driving to Kansas City.  Their car broke down in Rock Springs, Wyoming, and they decided to take a bus to Kansas City.  Walker stored 17 sheets of LSD in a condom and told Heschmeyer that he hid the LSD in his rectum.  Id. at 514.  They arrived in Kansas City on August 31, 2003.  Walker cut seven 100 hit sheets of LSD into ten hit strips and placed the strips in a bottle of Everclear to make liquid LSD for a buyer in Florida.  He packaged the liquid LSD into nine breath mint vials.

Several days later, Heschmeyer returned home and saw an unknown man sitting on her couch.  When Heschmeyer walked into the house, Walker handed her $4,500 and told her to store the money.  The visitor, May, was identified only as the "kid from Springfield," and he came to Kansas City to purchase liquid LSD from Walker.  Id. at 521.  In mid-September, May arranged

another purchase from Walker in Kansas City and the transaction occurred at Heschmeyer's home. Heschmeyer took $7,000 or $7,500 from May, and May purchased about 200 psilocybic mushrooms and seven to ten sheets of LSD from Walker.  May returned to Kansas City for one more transaction in late September or early October 2003.  May gave Heschmeyer $4,500 and, at Walker's direction, Heschmeyer sold May 700 hits of LSD and 50 to 100 psilocybic mushrooms.  Heschmeyer testified that Walker would periodically return to Kansas City to collect money from drug sales and sell drugs during his stay.  When Walker was ready to leave, Heschmeyer would use her credit card to charge Walker's airline ticket and Walker would repay her in cash.

On October 7, 2003, Walker purchased a van in Kansas City, and started to drive from Kansas City to New York.  Heschmeyer received on a phone call on October 8, 2003 from a nurse in West Virginia and learned that Walker was injured in an automobile accident.  Heschmeyer contacted Walker's brother, Jude Walker, and both Heschmeyer and Jude Walker drove to the hospital in Beckley, West Virginia.  When they arrived at the hospital, Heschmeyer testified that Walker was "freaking out," because he had hidden 22 sheets of LSD in the van.  Id. at 544.  Jude Walker recovered the LSD from the van.  After a few days, Heschmeyer and Jude Walker put Walker in Heschmeyer's car and drove to Buffalo, New York.  Heschmeyer stopped at Walker's house in Buffalo and Walker delivered the LSD to his wife.  Heschmeyer drove Walker to a nearby hospital and returned to Kansas City the next day.

Walker called Heschmeyer and asked to her to find sheets of LSD hidden throughout her house in Kansas City.  He also asked her to call previous buyers and attempt to sell the LSD.  She sold some of the LSD, but Walker became upset when she was unable to sell 13 of the sheets.  After Walker threatened to have Heschmeyer killed, they agreed that Jude Walker would pick up the

8

remaining sheets of LSD and Heschmeyer would wire Walker about $300 that Heschmeyer had received from drug transactions on behalf of Walker.   At the close of direct examination, Heschmeyer admitted that the government had given her testimonial immunity and she explained the details of the agreement during cross-examination.

The next witness who testified at trial was Stephen Weller.  Weller admitted that he had three previous felony convictions and was then currently in prison for crimes unrelated to those alleged against Walker.  In 2003, Weller moved into Heschmeyer's house as a paying roommate.  He observed Walker at the house on several occasions making individually-wrapped suckers with psilocybic mushrooms and Weller sometimes helped Walker package the mushrooms.  Weller had seen Walker in possession of seven to ten sheets of LSD and he watched Walker make liquid LSD by dipping strips of paper LSD into a bottle of grain alcohol.  After soaking the strips in a bottle of grain alcohol, Walker would pour the liquid into little vials or bottles.  On one occasion, Weller poured about a shot and a half of liquid from a bottle of Everclear into a glass of orange juice.  He described the effect of the liquid as worse than any LSD he had tried before and believed that the liquid contained approximately 10 or 15 hits of LSD.  Walker asked Weller to come to the Schwagstock festival and help him sell drugs, but Weller declined.  Walker later told Weller that he made over $10,000 at the festival.

Pursuant to a federal arrest warrant, Henry and Tulsa County Sheriff's Deputy Robert Joe Mieir arrested Walker in Buffalo, New York on July 22, 2004.  Id. at 767-68.  Mieir did not personally speak to Walker, but he overheard a conversation between Walker and Henry.  In a statement to Henry, Walker confirmed that he knew May and Heschmeyer.  On cross-examination,

Mieir acknowledged that Walker was cooperative and no drugs were found in his house or on his person when he was arrested.

Henry testified about his involvement in the investigation and his undercover contact with Ledbetter and May.  He described his initial purchases of paper LSD from Ledbetter on August 18 and September 2, 2003, and his subsequent purchases of LSD and Ecstasy from May.  However, Henry stated that his ultimate goal was to locate May's source.  After May was arrested, he agreed to cooperate with Henry and placed phone calls to Walker on November 25, 2003 and January 20, 2004.  May arranged a transaction with Walker in Kansas City around February 2004, and May, Henry, and another agent went to Kansas City to purchase LSD from Walker.  The deal fell through when Walker told May that he would not be in Kansas City to complete the sale and, pursuant to DEA guidelines, Henry aborted the transaction.  Id. at 908.  Henry testified about the extensive nature of Walker's organization based on information gathered from cooperating co-conspirators. He also described Walker's arrest on July 22, 2004, and testified that Walker admitted to selling LSD in the past.  Id. at 914.  After Henry completed his testimony, the government rested its case-in-chief.  Walker called one witness, Gerald Mazer, who testified that Heschmeyer handled drug transactions without contacting Walker and that Heschmeyer may have been upset at Walker for marrying another woman.  Id. at 1030-40.

On April 15, 2005, the jury returned verdicts finding Walker guilty on all five counts charged in the superseding indictment.  In addition, the jury determined beyond a reasonable doubt that Walker possessed more than ten but less than 120 grams of a mixture or substance containing LSD. Dkt. # 58, at 2.  Walker filed a pro se motion for mistrial (Dkt. # 61) on June 22, 2005, but the Court denied the motion because it was not filed within 7 days of the verdict.  Dkt. # 62.

The Court held three sentencing hearings to consider Walker's objections to the calculation of the drug quantity and the applicability of his prior convictions as a sentencing enhancement under § 841(b)(1).  The Court determined that Walker distributed 16,500 hits of LSD but reduced this number to 15,250 to avoid double-counting liquid and paper LSD.  Under the United States Sentencing Guidelines, the weight of 15,250 hits was equal to 6.1 grams of LSD.  The Court also attributed 7 grams of liquid LSD to Walker.  Based on a total drug quantity of 13.1 grams of LSD, Walker's base offense level was 32.  Walker's criminal history raised the offense level to 37 and this resulted in a guideline range of 360 months to life imprisonment.  However, the government alleged that Walker had three prior convictions for felony drug offenses.  Under § 841(b)(1), the existence of two prior felony drug offenses requires a court to impose a mandatory life sentence.

Walker objected to the Court's calculation of the weight of LSD, because the sentencing guidelines permitted the Court to consider more than the "pure" weight of LSD contained in the substances.  Dkt. # 69, at 3.  Walker's attorney cited a Fourth Circuit decision supporting this argument, but could not provide any Tenth Circuit precedent on this issue.   The Court determined that § 841 required it to consider the weight of the mixture or substance possessed by Walker and rejected Walker's argument.

Concerning Walker's prior convictions, the Court permitted Walker to present pro se arguments in addition to those arguments raised in written pleadings by his attorney.   The enhancement information listed three felony drug offenses: (1) Possession of Controlled Substance for Sale in San Francisco County, California, Case No. 163693, May 28, 1996; (2) Felony Possession of a Controlled Substance in Jackson County, Missouri, Case No. CR-91-2979, March 6, 1997; and (3) Criminal Sale of Controlled Substance in Erie County, New York, Case No. 2000-

2029-001, February 28, 2001.  Dkt. # 40.  At the July 14, 2005 sentencing hearing, the Court permitted the government to amend the enhancement information to reflect that Walker's conviction for possession of a controlled substance in Jackson County, Missouri was case number 96-70951 rather than case number CR-91-2979. Dkt. # 69, at 8.  Walker claimed that the California conviction did not count as a strike under California law and, alternatively, that a person named Chrysalis Maxon rather than Walker was convicted of the crime.  The Court found that Chrysalis Maxon was a known alias of Walker and he was the person convicted.  Id. at 21.  Even though the Court had certified records of two prior felony drug offenses, the Court continued the sentencing hearing twice to allow both parties to gather more information about the California conviction.  On July 26, 2005, the Court found that the California conviction was a felony drug offense under § 841(b)(1) and Walker had three prior felony drug offenses.  The Court sentenced Walker to life imprisonment based on the existence of two or more felony drug offenses.

Walker appealed his conviction and sentence to the Tenth Circuit.  The Tenth Circuit permitted Arnett to withdraw and appointed Thomas McCormick as Walker's appellate counsel. McCormick contacted Walker twice by letter before drafting an appellate brief.  On October 19, 2005, McCormick sent a letter to Walker notifying him of McCormick's appointment as appellate counsel.  On January 24, 2005, McCormick sent a letter to Walker notifying him that McCormick would not send defendant copies of transcripts and asking Walker to identify issues that could be raised on appeal.  McCormick decided to reject many of the arguments Walker wished to raise on appeal and, instead, challenged only the admissibility of Henry's "expert testimony as to the means drug traffickers use to avoid detection and arrest."  Dkt. # 108, at 6.  Walker filed at least two motions to remove McCormick as appellate counsel and to substitute a pro se brief drafted by

12

Walker for McCormick's appellate brief, but both motions were denied by the Tenth Circuit.  See Id. at 9 n.1 ("Walker has renewed his motions to file a supplemental brief and to replace his attorney, which were previously denied.  Once again, these motions are denied.  We note that in Walker's motion to file a supplemental brief, he indicated that he wished to assert the claim that this court lacks jurisdiction over this case.  This claim is meritless.").  The Tenth Circuit affirmed this Court's decision to admit Henry's testimony and Walker's conviction and sentence.  McCormick advised Walker of his right to seek review from the Supreme Court, and Walker asked McCormick to file a petition for writ of certiorari.  However, McCormick did not believe that a petition for writ of certiorari would be "legally sound" and declined to file a petition for writ of certiorari on Walker's behalf.  Dkt. # 137-3, Ex. B, at 2.

The Tenth Circuit issued its decision affirming Walker's conviction and sentence on May 30, 2006.  Walker's conviction became final on October 2, 2006 when his time to file a petition for writ of certiorari expired.[2]  Clay v. United States, 537 U.S. 522, 527 (2003).  Walker filed his motion to vacate, set aside, or correct sentence pursuant to § 2255 on October 1, 2007.  Therefore, Walker's motion was filed within the one year statute of limitations provided by § 2255, and his motion is timely.

## II.

Walker's § 2255 motion alleges 18 claims of ineffective assistance of counsel concerning the performance of his trial and appellate counsel and contains a lengthy supporting brief.  Walker argues that:

---

[2]        Walker requested an extension of time to file a petition for writ of certiorari and the Supreme Court extended his filing deadline to October 2, 2006.  However, he did not file a petition for writ of certiorari.

13

(1) appellate counsel was ineffective for refusing to file a supplemental brief drafted by Walker or raise arguments suggested by Walker;

(2) trial counsel was ineffective for improperly advising Walker about the consequences of rejecting the government's plea agreement;

(3) appellate counsel was ineffective for failing to keep in contact with Walker during his appeal;

(4) appellate counsel provided ineffective assistance of counsel when he refused to file a petition for writ of certiorari in the United States Supreme Court;

(5) appellate counsel was ineffective because he failed to review the entire appellate record when preparing Walker's appeal;

(6) appellate counsel failed to request information from Walker or trial counsel when preparing Walker's appeal;

(7) appellate counsel should have withdrawn from his representation of Walker or permitted Walker to proceed pro se;

(8) appellate counsel was ineffective for failing to challenge the drug quantity attributed to defendant;

(9) appellate counsel should have challenged the use of defendant's prior convictions as a statutory sentencing enhancement;

(10) trial counsel was ineffective because he did not understand federal drug laws;

(11) trial counsel failed to object to misconduct of the government's attorney during trial;

(12) trial counsel was ineffective for failing to report the misconduct of governmental agents that occurred during the investigation and at trial;

(13) trial counsel did not object to evidence of the details of defendant's prior drug trafficking offenses;

(14) trial counsel was ineffective for failing to file a pretrial motion to dismiss the indictment;

(15) trial counsel failed to object to the admission of transcripts of defendant's phone calls;

14

(16) trial counsel refused to provide effective representation because defendant did not fully pay trial counsel;

(17) trial counsel failed to request subpoenas for witnesses, hire experts or interview witnesses identified by defendant; and

(18) trial counsel failed to object to inflammatory statements of the government's attorney during trial.

The government has responded to each claim and asserts that neither defendant's trial nor appellate counsel was ineffective at any stage of this case.

As a preliminary matter, the Court notes that many of defendant's arguments are vague, speculative, and repetitious.  Consistent with Supreme Court and Tenth Circuit precedent, the Court will construe defendant's pro se pleadings liberally.  Haines v. Kerner, 404 U.S. 519, 520 (1972); Gaines v. Stenseng, 292 F.3d 1222, 1224 (10th Cir. 2002).  "Although '[a] pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers,' . . . 'pro se parties [must] follow the same rules of procedure that govern other litigants.'" Garrett v. Selby Connor Maddux & Janer, 425 F.3d 836, 840 (10th Cir. 2005) (quoting Nielsen v. Price, 17 F.3d 1276, 1277 (10th Cir. 1994)).  The Court has no obligation to construct legal arguments for defendant or fashion an argument for defendant if his motion is incoherent or unintelligible.  See United States v. Fisher, 38 F.3d 1144, 1147 (10th Cir. 1994); Drake v. City of Fort Collins, 927 F.2d 1156, 1159 (10th Cir. 1991).

## A.

To establish ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that the deficient performance was prejudicial.  Strickland v. Washington, 466 U.S. 668, 687 (1984); Osborn v. Shillinger, 997 F.2d 1324, 1328 (10th Cir. 1993). A defendant can establish the first prong by showing that counsel performed below the level

15

expected from a reasonably competent attorney in criminal cases.  Strickland, 466 U.S. at 687-88.

There is a "strong presumption that counsel's conduct falls within the range of reasonable

professional assistance." Id. at 688.  In making this determination, a court must "judge . . . [a]

counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's

conduct." Id. at 690.  Moreover, review of counsel's performance must be highly deferential.  "[I]t

is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude

that a particular act or omission of counsel was unreasonable." Id. at 689.

To establish the second prong, a defendant must show that this deficient performance

prejudiced the defense to the extent that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different.  A reasonable

probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; see also

Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993).   In Glover v. United States, 531 U.S. 198, 199

(2001), the Supreme Court held that "any amount of actual jail time has Sixth Amendment

significance."  Thus, the prejudice prong of the Strickland test does not require that any increase in

sentence must meet a standard of significance.  See United States v. Horey, 333 F.3d 1185, 1187-88

(10th Cir. 2003).

**B.**

Defendant has alleged ten claims of ineffective assistance of counsel concerning the

performance of his trial counsel.  These claims do not fall into neat categories, but the government

has divided these claims into four broad groups: (1) trial counsel did not understand federal drug

laws and could not effectively represent defendant during plea negotiations or trial; (2) trial counsel

failed to object to a wide range of alleged governmental misconduct; (3) trial counsel failed to raise

16

certain objections suggested by defendant and did not file a motion to dismiss the indictment; and (4) trial counsel provided substandard representation because defendant could not pay him. Dkt. # 137, at 58. The Court will use this framework to group defendant's numerous and often overlapping claims of ineffective assistance of counsel.

Trial Counsel's Failure to Understand the Charges Against Defendant (Claims Two and Ten)

Defendant argues that trial counsel was not experienced in federal drug cases and could not properly advise him about trial or sentencing issues. The government responds that defendant rejected trial counsel's advice to accept a plea agreement that would have reduced his sentence and trial counsel fully understood the charges against defendant. Claim Two is primarily a challenge to the allegations of the indictment and defendant faults trial counsel for failing to file a motion to dismiss the charges in the indictment. Dkt. # 125, at 38-41. He asserts that the indictment did not allege the essential elements of the charged crimes or contain sufficient facts to put defendant on notice of the conduct constituting the offenses. Likewise, defendant challenges the allegations of the indictment in Claim Ten and faults trial counsel for refusing to file a motion to dismiss. Dkt. # 125-2, at 15-18. However, defendant's brief does not clearly identify how trial counsel misunderstood the charges in the indictment.

Arnett has submitted an affidavit explaining his actions during plea negotiations and trial and states that he repeatedly advised defendant to accept the plea agreement offered by the government:

5.    Shortly after I was retained, a Rule 11 session was conducted with AUSA Robert T. Raley, counsel for the United States, and case agents in charge of the investigation. During this time the possibility of a negotiated plea was discussed. I do not recall the specific details at this time but do remember that Mr. Walker was adamant that he would not accept any offer that would result in his serving any significant amount of prison time. During my conversation with Mr. Walker, I repeatedly informed him that if he did not accept the government's plea offer, the government would file [a] sentencing

information based on his prior convictions that would result in a life sentence if he was convicted at trial.  Therefore, I advised him that, given the strength of the government's case, the best way to reduce his exposure was to enter the offered plea agreement with the government.  He nonetheless insisted that he would not take the government's offer . . . .   As a result, the government filed [a] sentencing information based on Mr. Walker's' three prior felony drug convictions . . . .

6.      Contrary to Mr. Walker's assertions, I fully understood the charges in the indictment, and sentencing implications of the charged crimes.  I endeavored to explain the charged crimes to Mr. Walker as well as I could.  I understood that Mr. Walker faced statutory mandatory minimums, and that if he failed to plead guilty, the government would file information to enhance those mandatory minimums, based on his prior drug convictions.  I explained this possibility to Mr. Walker, and he nevertheless insisted on going to trial.

Dkt. # 137-2, Ex. A, at 2.  Arnett also states that he thoroughly reviewed the indictment and

discovery materials to determine if defendant had any colorable issues for a pretrial motion and he

did not find any basis to file a motion to dismiss.  Id.

Construing defendant's arguments broadly, it appears that defendant disputes trial counsel's

statement that defendant lacked a colorable basis to challenge the government's factual allegations

through a pretrial motion to dismiss.  Dkt. # 125, at 41.  However, defendant misunderstands the

purpose of a motion to dismiss.  When a reviewing a motion to dismiss an indictment under Fed. R.

Crim. P. 12(b)(3)(B), a court must assume that the government could prove the factual allegations

in the indictment and make all factual inferences in favor of the government.  United States v.

Jeronimo-Bautista, 425 F.3d 1266 (10th Cir. 2005).  Trial counsel correctly advised defendant that

he could not challenge the government's factual allegations with a motion to dismiss and this does

not constitute ineffective assistance of counsel.  Defendant's proposed motion to dismiss would have

directly challenged the accuracy of the facts stated in the indictment and the testimony of the

government's witnesses, and this type of pretrial motion is not permitted under the Federal Rules of Criminal Procedure.

Defendant's argument could also be construed as claim that trial counsel erroneously advised him to go to trial rather than accept a plea agreement. Contrary to defendant's assertion in Claim Two, his attorney consistently advised him to accept a plea agreement rather than risk trial and defendant rejected that advice. Trial counsel negotiated a plea agreement with the government that could have substantially reduced defendant's sentence and it appears that defendant initially agreed to accept the plea agreement. The government fulfilled its end of the plea agreement by filing a superseding information reducing the drug quantity for which defendant would be responsible at sentencing and the Court set a pretrial/change of plea hearing for January 4, 2005. Against trial counsel's advice, defendant rejected the plea agreement because it would have required him to serve significant time in prison and he did not change his plea on January 4, 2005. Defendant does not identify any specific legal advice given by trial counsel that was inaccurate or misleading and trial counsel states that he advised defendant of the consequences if he rejected the plea agreement. Nothing in defendant's § 2255 motion suggests that trial counsel's affidavit is inaccurate. Even if the Court were to assume that trial counsel failed to advise defendant to accept the plea agreement, he denies his guilt for the underlying offenses to this day and his motion gives no indication that he would have accepted the plea agreement.

In Claim Ten, defendant argues that trial counsel did not understand federal drug laws and he was incapable of effectively representing defendant at any stage of the case. The Court has reviewed the docket sheet, all pretrial filings, and the transcripts of the jury trial and sentencing, and finds no evidence supporting defendant's claim. Even if trial counsel did not file all motions

requested by defendant, he made appropriate written or oral objections to evidence before and during the trial. Specifically, trial counsel filed written responses to the government's Rule 404(b) notice and motion in limine concerning Heschmeyer's testimony. Dkt. ## 49, 51. Trial counsel states that he made objections during trial when he believed objections were warranted and the trial transcript supports his statement. Dkt. # 137-2, Ex. A, at 2. Defendant argues that witnesses provided false evidence at trial and trial counsel's failure to object to this false evidence suggests he did not understand the charges against defendant. However, the trial transcript shows that trial counsel cross-examined all of the witnesses that defendant accuses of testifying falsely and his cross-examination reflects an understanding of the charges alleged in the indictment. Defendant's claim that trial counsel did not understand the nature of the charged offenses is not supported by the record.

Trial Counsel's Failure to Object to Prosecutorial and Other Governmental Misconduct (Claims Eleven, Twelve and Eighteen)

Defendant claims that trial counsel failed to object to a wide range of governmental misconduct and this constitutes ineffective assistance of counsel. In Count Eleven, he argues that the AUSA lied about the substance of the government's plea agreement with May and improperly vouched for May and other government witnesses. Defendant argues in Count Twelve that trial counsel failed to object to false evidence offered by Henry linking defendant to Russian mobsters, even though trial counsel allegedly knew that this evidence was false. In Count Eighteen, defendant accuses the AUSA of eliciting false testimony, altering court transcripts, and making inflammatory statements, and he claims that trial counsel failed to object to any of the alleged misconduct. The government responds that defendant has not provided any factual support for these arguments. The government also argues that trial counsel made a strategic choice to challenge the veracity of the

government's witnesses through cross-examination and defendant's claims that the AUSA or federal agents vouched for the government's fact witnesses is meritless.

Defendant's claim that Arnett was ineffective for failing to object to the government's direct examination of May is meritless.  At the beginning of May's testimony, the AUSA asked May about any criminal charges against him and May admitted that he had pled guilty to drug charges pursuant to a plea agreement.  Dkt. # 97, at 257.  May stated that he had not been sentenced but he expected the receive a shorter sentence if he provided truthful testimony against defendant.  Trial counsel cross-examined May about his understanding of the plea agreement and he unequivocally responded that he was hoping for a lighter sentence in exchange for his testimony.  Dkt. # 97, at 373.  The jury was clearly informed of May's plea agreement and any benefit that May would receive from testifying at defendant's trial.  In addition, the Court instructed the jury that the testimony of a witness testifying pursuant to a plea agreement should be "received with caution and considered with great care."  Dkt. # 57, at 21-22.  Defendant's argument that the jury was not fully informed about May's plea agreement with the government is not supported by the record.  In any event, defense counsel cross-examined May about his plea agreement and May freely admitted that he was testifying against defendant in the hope of receiving a lighter sentence.  Therefore, trial counsel's performance was not constitutionally deficient in this respect.

In Claim Twelve, defendant argues that Henry offered false evidence at trial, including evidence linking defendant to Russian mobsters, and trial counsel was ineffective when he failed to object to Henry's testimony.  Defendant's conclusory allegation that "Henry is a huge lier [sic]" is insufficient to state a claim that would permit the Court to vacate or set aside his conviction.  Dkt. # 125-2, at 21.  In any event, Henry's trial testimony did not address defendant's alleged connection

21

to Russian mobsters and it is not clear how defendant's allegations of Henry's misconduct are relevant.  At trial, Henry testified about his receipt of LSD from Ledbetter and DEA procedures for handling narcotics.  Dkt. # 99, at 822-27.  Trial counsel cross-examined Henry about the DEA's procedures for handling narcotics and there is no indication that Arnett's performance was deficient in this respect.  Henry also testified about his investigation of Walker and the participation of Walker's co-conspirators in the investigation, but the Court finds no evidence that Henry made the improper allegations suggested by defendant.  Therefore, Claim Twelve should be denied.

In Claim Eighteen, defendant argues that trial counsel was ineffective at trial because he refused to call rebuttal witnesses identified by defendant.  He provides two names, Brent Lavers and Jude Walker, but he does not discuss the contents of their proposed testimony.  Without a proffer of the proposed testimony, the Court can not consider defendant's claim as a basis to grant relief. See United States v. Cervini, 379 F.3d 987, 993-94 (10th Cir. 2004).  He also raises additional allegations of prosecutorial misconduct.  However, these allegations are so vague that the Court can not discern a legitimate legal argument, and Claim Eighteen is denied in its entirety.  Fisher, 38 F.3d at 1147 ("we are not required to fashion Defendant's arguments for him where his allegations are merely conclusory in nature and without supporting factual averments").

Trial Counsel's Failure to Object to the "Details" of Defendant's Prior Convictions (Claim Thirteen)

Defendant argues that trial counsel failed to object to the government's use of defendant's prior conviction for LSD distribution and the details of that conviction.  However, the record shows that trial counsel vigorously argued on defendant's behalf in attempt to exclude this evidence.  After receiving the government's notice of Rule 404(b) evidence, trial counsel objected, in a pretrial motion in limine,  to the government's use of this evidence, and raised the same objection at trial.

Dkt. # 49; Dkt. # 99, at 878-81.  The record is clear that trial counsel objected to the government's use of Rule 404(b) evidence and his performance was not deficient.  Defendant also argues that he would have testified at trial to rebut the government's evidence, but trial counsel advised defendant against testifying due to the existence of multiple prior convictions.  Defendant does not argue that trial counsel refused to allow defendant to testify or did not explain that defendant had a constitutional right to testify, but merely that trial counsel advised defendant against testifying at trial.  This was a strategic choice by counsel and defendant.  Because defendant admits that trial counsel presented him with a choice and fully explained the consequences of testifying, trial counsel did not interfere with defendant's constitutional right to testify and counsel's performance was not constitutionally deficient.  Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997); United States v. Teague, 953 F.2d 1525, 1533 (11th Cir. 1992).

Trial Counsel's Refusal to File Pretrial Motion to Dismiss Indictment (Claim Fourteen)

Defendant claims that trial counsel should have filed a motion to dismiss the indictment.  The basis for the proposed motion to dismiss is not clear from defendant's § 2255 motion, but it appears that defendant believes the indictment was defective because it did not state the number of hits of LSD that defendant conspired to distribute.  Dkt. # 125-2, at 37-40.   The superseding indictment alleges that defendant "knowingly and intentionally conspire[d] . . . to distribute . . . more than ten (10) grams of a mixture or substance containing a detectable amount" of LSD.  Dkt. # 6, at 1.  This allegation is sufficient to state a charge under § 841(a) and (b)(1) and put defendant on notice of the drug quantity involved in the conspiracy.  Therefore, trial counsel's decision not to file a motion to dismiss was reasonable and his performance was not constitutionally deficient.  United States v.

Gibson, 55 F.3d 173, 179 (5th Cir. 1995) ("Counsel is not required by the Sixth Amendment to file meritless motions.").

Trial Counsel's Failure to Object to the Government's Use of Transcripts of Defendant's Phone Calls at Trial (Claim Fifteen)

Defendant claims that the government added "false words" to the transcripts of defendant's phone calls, and trial counsel "failed to force [the government] to provide phone company experts or experts for the defense." Dkt. # 125-2, at 40.  At trial, the Court admitted audiotapes of defendant's phone conversations with May.  However, the Court permitted the government to use the transcripts as demonstrative aids only, and the jury was not allowed to take the transcripts to the jury room during deliberations. Dkt. # 97, at 318-22.  Trial counsel objected to the use of transcripts in any capacity and stated:

> I do have objections to those, Your Honor, on a couple of bases.  First of all, the excerpts of the transcripts take certain statements and certain sentences out of the context of the entire conversation.  Secondly, in light of the Court's previous ruling that the transcript would not go into the jury room, this sort of defeats the purpose of that.  Again, the tape, in and of itself, is the piece of evidence, and we have no objection to that.

Id. at 321.  Although the Court overruled his objection, the trial transcript reflects that Arnett made a timely objection to the government's use of the transcripts of phone conversations.

The use of the transcripts as a demonstrative aid to assist the trier of fact was a decision within the Court's discretion and, if other evidentiary requirements were satisfied, the Court could have admitted the transcripts as evidence.  United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995); United States v. Devous, 764 F.2d 1349, 1354-55 (10th Cir. 1985).  In this case, the Court declined to admit the transcripts, but permitted the jury to view the transcripts as demonstrative aids.  Trial counsel made an appropriate objection to the use of transcripts as demonstrative aids and his

24

performance did not fall below an objective standard of reasonableness. Defendant's argument that trial counsel failed to request an expert is vague and unsubstantiated, and defendant does not suggest what assistance an expert could have provided at trial. Therefore, Claim Fifteen of defendant's § 2255 motion is denied.

<u>Trial Counsel's Failure to Provide Effective Representation Due to Defendant's Failure to Pay (Claim Sixteen)</u>

Defendant argues that trial counsel failed to provide adequate representation at trial, because defendant refused to pay the full amount owed to trial counsel. Specifically, defendant alleges that trial counsel refused to file pretrial motions, retain experts, call rebuttal witnesses, object to prosecutorial misconduct, or cross-examine witnesses due to underpayment. Trial counsel submitted an affidavit refuting defendant's allegations, which states:

> Although Mr. Walker correctly states that he did not pay my agreed upon attorney's fee, and I repeatedly attempted to collect those fees from Mr. Walker and his family, his failure to pay did not in any way affect my defense of his case. I believe that I exerted every possible effort on Mr. Walker's behalf, and represented him to the best of my ability given the facts of his case. I frequently met with Mr. Walker and responded to all of his questions. I specifically recall that I even drove to Tulsa from Oklahoma City on a Saturday night because I had received a letter from Mr. Walker indicating that he was very concerned about certain aspects of his case. I recall this specific meeting because Mr. Walker commented that other inmates in his cell block were surprised that he had an attorney who would spend his Saturday night visiting with his client in jail.

Dkt. # 137-2, Ex. A, at 3. The government responds that trial counsel's performance before, during, and after trial shows that he zealously represented defendant at every stage of the proceedings.

The Court has reviewed the entire record, including the docket sheet, motions, and trial and sentencing transcripts, and finds that defendant's claim is meritless. Trial counsel negotiated a plea agreement with the government that would have substantially reduced defendant's sentence, but defendant refused to change his plea to guilty. Although defendant asserts that trial counsel refused

to file a pretrial motion to dismiss, trial counsel filed a motion for discovery of audiotapes in the government's possession and objected to the government's Rule 404(b) notice.  The trial transcript shows that trial counsel cross-examined the government's witnesses and objected to evidence regularly.  At defendant's request, trial counsel objected to the drug quantity stated in the presentence investigation report and requested an evidentiary hearing.  Dkt. # 65.  He also represented defendant during three separate sentencing hearings and raised many arguments, including allowing defendant to present his pro se arguments, in an attempt to obtain a sentence below the life sentence required by statute.  Dkt. ## 68, 102, 103.  There is no evidence supporting defendant's claim that trial counsel provided inadequate representation due to defendant's failure to pay, and Claim Sixteen is denied.

Trial Counsel's Refusal to Contact or Subpoena Witnesses Identified by Defendant (Claim Seventeen)

Defendant alleges that trial counsel provided ineffective assistance of counsel because he failed to interview potential witnesses before trial or to subpoena favorable witnesses to testify at trial.  An attorney's failure to investigate can constitute deficient performance if the attorney fails to perform an investigation and this failure resulted from negligence rather than a conscious decision to conserve an attorney's limited time and resources.  Strickland, 466 U.S. at 690-91.  If trial counsel is aware of the existence of a witness but exercises his discretion not to conduct an interview, this does not constitute ineffective assistance of counsel if the attorney's decision was reasonable.  Gilson v. Sirmons, 520 F.3d 1196, 1247 (10th Cir. 2008).  However, an attorney's failure to investigate "cannot be charged as a claim of 'ineffective assistance of counsel' when the essential and foundational information required to trigger such an investigation is withheld from the

defendant's attorney by the defendant himself." United States v. King, 936 F.2d 477, 480 (10th Cir. 1991).

In this case, defendant has not identified a single witness that trial counsel failed to interview or subpoena. Instead, defendant makes vague allegations that trial counsel should have contacted associates of May or Ledbetter to contradict the government's evidence that defendant was part of a conspiracy to sell illegal drugs in Oklahoma. In his affidavit, trial counsel states that:

> Mr. Walker and I had a number of discussions about potential defense witnesses. To [the] best of my recollection I contacted or attempted to contact any witnesses for whom Mr. Walker could provide a telephone number or an address. As I recall, there were a number of witnesses who Mr. Walker was unable to identify either by full name or by name and contact information. To the best of my knowledge, there were no witnesses who were not called because of a lack of funds or because the defense failed to serve a subpoena on a witness for whom Mr. Walker had a valid service address.

Dkt. # 137-2, Ex. A, at 3. Defense counsel can not be found ineffective for failing to interview witnesses for whom defendant failed to provide minimal contact information or could not identify by full name. Likewise, Arnett can not be held responsible for failing to subpoena an unidentified witness, because a subpoena can only be served upon a "named witness." Fed. R. Civ. P. 17(b). Therefore, the Court finds that defendant's claim for ineffective assistance of counsel based on trial counsel's failure to interview or subpoena witnesses is meritless.

## C.

Defendant also challenges the performance of his appellate counsel in that appellate counsel failed to raise certain arguments on appeal. Further, he claims that appellate counsel treated defendant improperly during the appellate process and appellate counsel should have withdrawn from the representation. To the extent that defendant alleges certain arguments should have been raised on appeal, the Court must consider the merits of the omitted issue. United States v. Cook, 45

F.3d 388, 392 (10th Cir. 1995).  "If the omitted issue is without merit, counsel's failure to raise it 'does not constitute constitutionally ineffective assistance of counsel.'"  Id.

Appellate Counsel's Refusal to File Defendant's Pro Se Supplemental Brief (Claim One)

Defendant claims that he asked appellate counsel to file a supplemental brief drafted by defendant raising additional issues, but appellate refused to file the brief.  However, defendant fails to note that he attempted to file several pro se briefs during his appeal and the Tenth Circuit rejected the briefs as meritless.  See Dkt. # 108, at 9.  If the Tenth Circuit refused to consider the arguments raised in the supplemental brief and described them as "meritless," this also means that the Tenth Circuit would have found the arguments meritless if appellate counsel had raised them on defendant's behalf.

The Court has independently reviewed defendant's supplemental brief (Dkt. # 125-6, at 15) and concurs with the Tenth Circuit's judgment that the arguments raised in this brief are meritless. Defendant attempted to raise numerous ineffective assistance of counsel claims on direct appeal, but such claims must ordinarily be raised in collateral proceedings.  United States v. Brooks, 438 F.3d 1231, 1242 (10th Cir. 2006).  The remaining arguments have already been considered in this Opinion and Order and have been rejected.  Therefore, the arguments in the supplemental brief lacked merit and appellate counsel was not constitutionally ineffective for refusing defendant's request to file the brief.

Appellate Counsel's Refusal to File A Petition for Writ of Certiorari on Defendant's Behalf (Claim Four)

Defendant claims that appellate counsel refused to file a petition for a writ of certiorari with the United States Supreme Court.  However, defendant may not rely on his appellate counsel's failure to request discretionary review from the Supreme Court to support an ineffective assistance

28

of counsel claim.  The right to counsel extends to a defendant's first appeal and the Sixth Amendment provides a defendant the right to effective assistance of counsel during this initial appeal.  Douglas v. California, 372 U.S. 353, 357-58 (1963).  However, the Due Process Clause of the Fourteenth Amendment does not guarantee a right to counsel for a litigant seeking a writ of certiorari from the Supreme Court and a "litigant . . . without a constitutional right to counsel cannot 'be deprived of the effective assistance of counsel.'" Steele v. United States, 518 F.3d 986, 988 (8th Cir. 2008).

Appellate counsel states that he advised defendant of his right to file a petition for writ of certiorari with the Supreme Court, but appellate counsel did believe that defendant had any legitimate ground to seek Supreme Court review.  Dkt. # 137-3, Ex. B, at 2.  Although defendant asked appellate counsel to file a petition for writ of certiorari, appellate counsel had no obligation to file a petition for defendant because the right to counsel does not extend to discretionary review by the Supreme Court.  Based on defendant's § 2255, he was clearly aware of his right to seek review from the Supreme Court and appellate counsel states that he advised defendant of his right to file a discretionary appeal.  In fact, defendant requested and received an extension of time to file his own petition, and he failed to do so.  Under the circumstances, the Court finds that appellate counsel did not provide ineffective assistance of counsel when he declined to file a petition for writ of certiorari on defendant's behalf.

Appellate Counsel's Failure to Challenge the Drug Quantity on Appeal (Claim Eight)

Defendant claims that appellate counsel should have appealed the jury's determination that he possessed or distributed ten grams or more of LSD as part of a drug conspiracy.  The government responds that it presented evidence showing that defendant possessed with intent to distribute or

distributed at least 16,500 hits of LSD and at least 5.6 grams of liquid LSD. Dkt. # 127, at 36. Defendant's argument is difficult to follow, and the Court will not attempt to fashion a legitimate argument for defendant. Instead, the Court will review the evidence presented at trial to determine if the jury could reasonably have concluded that the amount of LSD exceeded 10 grams. If the jury reasonably determined that the drug quantity exceeded 10 grams, appellate counsel can not be found ineffective for failing to challenge the drug quantity on appeal.

At trial, the Court submitted special interrogatories to the jury concerning the amount of LSD involved in the conspiracy. The jury found that the conspiracy involved more than ten but less than 120 grams of LSD and this finding was amply supported by the evidence. Dkt. # 58, at 2. May testified that he purchased 4000 hits of LSD from defendant and he observed at least 20 sheets, or 2000 hits, of LSD in defendant's possession. Dkt. # 97, at 296, 298. May also observed defendant place over 300 strips, or 3000 hits, of LSD in a bottle of grain alcohol to convert the LSD from paper to liquid form. Ledbetter testified that he purchased four vials of liquid LSD from May, and each vial contained 100 hits of LSD. Ledbetter and May linked defendant to the distribution of approximately 9000 hits of LSD. Heschmeyer testified that she assisted defendant with the distribution of LSD or observed defendant in possession of LSD at various times. In Rock Springs, Wyoming, she noticed that defendant had 17 sheets of LSD, and each sheet contained 100 hits. She also observed defendant package nine vials of liquid LSD for shipment to Florida, and each vial contained 100 hits. Following a car accident in West Virginia, Jude Walker recovered 22 sheets of LSD from defendant's vehicle and the sheets contained 2200 hits of LSD. Defendant also disclosed that he had hidden 17 sheets of LSD throughout Heschmeyer's house. In total, Heschmeyer's testified that Walker possessed or distributed an additional 6,500 hits of LSD. Weller also observed

defendant in possession of approximately 700 to 1000 hits of LSD and he drank from a bottle of grain alcohol in which Walker had placed strips of LSD.  The government also presented evidence that defendant possessed and distributed additional amounts of liquid LSD.  For sentencing purposes, the Court reduced the number of hits to 15,250 to avoid double counting the liquid LSD and treated each hit of LSD as .4 milligrams of LSD.  This resulted in a total weight of 6.1 grams. The Court also determined that defendant possessed or distributed an additional 7 grams of liquid LSD.  The total amount of LSD for sentencing purposes was 13.1 grams.

The transcripts of the trial and sentencing hearings clearly show that defendant possessed with intent to distribute or distributed more than 10 grams of LSD.  Although defendant asked appellate counsel to challenge the drug quantity on appeal, this argument lacks merit and there was no reason for appellate counsel to raise this argument.  Therefore, defendant's claim of ineffective assistance of counsel based on appellate counsel's refusal to appeal the drug quantity is denied.

<u>Appellate Counsel's Failure to Appeal the Use of Defendant's Prior Convictions to Enhance His Sentence (Claim Nine)</u>

Defendant argues that appellate counsel should have challenged the applicability of defendant's prior convictions as felony drug offenses under 21 U.S.C. § 841(b)(1), because the government did not prove the facts underlying those convictions beyond a reasonable doubt.  The government responds that it produced certified copies of court records proving that defendant had previously been convicted of three felony drug offenses.  At defendant's sentencing hearings, the Court determined that defendant had been convicted of: (1) Possession of Controlled Substance for Sale in San Francisco County, California, Case No. 163693, May 28, 1996; (2) Felony Possession of a Controlled Substance in Jackson County, Missouri, Case No. 96-70951, March 6, 1997; and (3) Criminal Sale of Controlled Substance in Erie County, New York, Case No. 2000-2029-001,

31

February 28, 2001.  Dkt. # 73, at 4.  The Court also found that two of these convictions qualified as prior controlled substance convictions under section 4B1.2 of the United States Sentencing Guidelines.  Id.

Section 841(b)(1)(A) requires the Court to impose a mandatory minimum sentence of life imprisonment if a defendant has two or more prior felony drug offenses.  The term "felony drug offense" is defined as "an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic, drug, marihuana, anabolic steroids, or depressant or stimulant substances."  21 U.S.C. § 802(44).   If a defendant challenges the validity of a conviction or the applicability of a conviction as a felony drug offense, he must file a written response to the enhancement information and the Court shall hold a hearing to determine if the defendant is eligible for increased punishment. 21 U.S.C. § 851(c).

In this case, the government presented court records proving the existence and applicability of defendant's prior felony drug offenses beyond a reasonable doubt. The Court held three sentencing hearings to resolve defendant's objections on this issue and permitted defendant to offer any evidence he had challenging the validity or applicability of the convictions.  The Court has reviewed the transcript from each of those hearings and notes that defendant did not present any evidence refuting the existence of his prior drug offenses.  Although there was a legal issue as to the applicability of defendant's California conviction, the Court reviewed a certified copy of the conviction and determined that it was a felony drug offense under California law.  Dkt. # 73, at 3. In his § 2255 motion, defendant does not cite any evidence questioning the Court's findings. Instead, he makes vague allegations that appellate counsel should have argued his prior convictions

were "bogus."  Dkt. # 125-2, at 13.  The Court finds that defendant's challenge to the applicability

of his prior convictions is meritless, and appellate counsel acted reasonably when he declined to

raise this issue on appeal.

Appellate Counsel's Failure to Have Adequate Personal Contact with Defendant (Claims Three and
Six)

Defendant claims that appellate counsel refused to speak to defendant, to respond to

defendant's phone calls or letters, and to confer with defendant or Arnett about issues that should

have been raised on appeal.  Appellate counsel has submitted an affidavit stating that he sent two

letters to defendant and requested information from defendant about possible appellate issues.  Dkt.

# 137-3, Ex. B, at 1.  The government argues that this was sufficient contact between defendant and

appellate counsel, and defendant's disagreement with appellate counsel's decisions does not show

that a total breakdown of the attorney/client relationship occurred.

The Tenth Circuit has recognized that a complete breakdown of the attorney/client

relationship can render an attorney's representation constitutionally deficient.  Romero v. Furlong,

215 F.3d 1107, 1113 (10th Cir. 2000).  In the context of a § 2255 motion, a court should consider

four factors:

> 1) whether the defendant's motion for new counsel was timely; 2) whether . . . [the]
> court adequately inquired into defendant's reasons for making the motion; 3) whether
> the defendant-attorney conflict was so great that it led to a total lack of
> communication precluding an adequate defense; and 4) whether the defendant
> substantially and unreasonably contributed to the communication breakdown.

United States v. Lott, 310 F.3d 1231, 1250 (10th Cir. 2002).  A court must distinguish between

"effective communication and effective assistance," because even frequent contact between attorney

and client does not guarantee effective representation.  Id. at 1252.  To demonstrate the existence

of a severe and pervasive conflict, a defendant's disagreement with his attorney's strategic decisions will not suffice.  United States v. Porter, 405 F.3d 1136, 1140 (10th Cir. 2005).

In this case, defendant's disagreement with appellate counsel's strategic decisions does not rise to the level of a complete breakdown of the attorney/client relationship, and a constitutional violation has not occurred.   Defendant filed a motion asking the Tenth Circuit to remove McCormick as appellate counsel, and the motion was denied. Dkt. # 125-5, at 18. Defendant states that his motion was premised on a disagreement between attorney and client about issues that should be raised on appeal but, without more, this is insufficient to state a claim of ineffective assistance of counsel.   Although it is clear that appellate counsel did not frequently communicate with defendant, the record does not show that a complete breakdown of the attorney/client relationship occurred.[3]   However, even if the Court were to assume that a breakdown in communication occurred, defendant has failed to identify any non-frivolous arguments that could have been raised on appeal, and he can not show that he suffered any prejudice.    Therefore, Claims Three and Six of defendant's motion are denied.

Appellate Counsel's Failure to Review the Entire Record (Claim Five)

Defendant argues that appellate counsel did not review or even request the entire record when preparing defendant's appeal.  Specifically, he claims that appellate counsel did not request a transcript of the July 14, 2005 sentencing hearing and failed to challenge the applicability of defendant's California conviction for possession of a controlled substance for sale.  However, the

---

[3]      Defendant has submitted as exhibits copies of his letters to appellate counsel, and the letters show that defendant adopted a combative tone with appellate counsel when it became clear that appellate counsel would not raise all of the arguments proposed by defendant. See Dkt. # 125-5, at 5-10; id. at 22-25.  Defendant's own conduct certainly contributed to any discomfort in the attorney/client relationship.

designation of record (Dkt. # 93) shows that a transcript of the July 14, 2005 hearing was prepared on July 18, 2005 and this transcript was designated as part of the appellate record. To the extent that defendant claims appellate counsel was ineffective for failing to challenge the use of prior convictions as a sentencing enhancement, that argument has been considered and rejected as meritless. Defendant's claim could also be construed as an argument that appellate counsel failed to raise issues identified by defendant. However, appellate counsel states that he considered these arguments and determined them to be frivolous. Dkt. # 137-3, Ex. B, at 1. Appellate counsel made a strategic decision to limit the issues raised on appeal and the Court will not second-guess his decision. Therefore, defendant has not shown that appellate counsel failed to consider the entire record or defendant's requested appellate arguments, and Claim Five is denied.

Appellate Counsel's Failure to Withdrawn (Claim Seven)

Defendant argues that appellate counsel should have withdrawn from his representation of defendant, and his failure to withdraw constitutes ineffective assistance of counsel. The Court has already determined that a complete breakdown of the attorney/client relationship did not occur, and appellate counsel did not have an obligation to withdraw from the representation. More importantly, defendant asked the Tenth Circuit to remove McCormick as appellate counsel and the Tenth Circuit denied defendant's motion. This Court finds that appellate counsel was not ineffective for declining to file a motion to withdraw when it is clear that the motion would have been denied by the Tenth Circuit. Although the Court has examined defendant's disagreement with appellate counsel's decisons, defendant's dispute with his attorney's strategic choices does not rise to the level of ineffective assistance of counsel. Claim Seven of defendant's motion is denied.

**IT IS THEREFORE ORDERED** that defendant's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Dkt. # 116) is **denied**. A separate judgment is entered herewith.

**DATED** this 5th day of August, 2008.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT